UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | CV 13-08379-AB (PLAx) | Date: | March 24, 2015 |

Title: *Totally Her Media, LLC v. BWP Media USA, Inc.*

Present: The Honorable  ANDRÉ BIROTTE JR.

| Carla Badirian | N/A |
| Deputy Clerk | Court Reporter |

Attorneys Present for Plaintiff:  Attorneys Present for Defendants:

None Appearing  None Appearing

**Proceedings:**  **[In Chambers] Order GRANTING Plaintiff and Counter-Defendant's Motion for Summary Judgment (Dkt. No. 35)**

Pending before the Court is Plaintiff TotallyHer Media, LLC's unopposed motion for summary judgment. (Dkt. No. 35.) As discussed more fully below, the undisputed facts in this copyright action demonstrate that Plaintiff is entitled to the safe harbor protections of the Digital Millennium Copyright Act ("DMCA," 17 U.S.C. §502) and is immune from liability from Defendant's claims of copyright infringement as a matter of law. The undisputed evidence further demonstrates that Plaintiff is not otherwise liable for direct or vicarious copyright infringement as a matter of law, and the Court **GRANTS** Plaintiff's for summary judgment.

## I. Background

### A. The Fashion Spot Community Forum and Plaintiff's DMCA Policy

Plaintiff operates a web-based social media and community discussion forum called "The Fashion Spot Community Forum" ("Fashion Spot"). (Defendant's Undisputed Material Fact ("UMF") No. 1; Dkt. No. 36.) The website has more than 70,000 account holders worldwide, who are able to express, share, and discuss their

opinions on fashion and the fashion industry on the Fashion Spot website. (UMF Nos. 2 & 3.) The Fashion Spot website is designed to be, and used by its members as, a vibrant community for open discussions and debates about the fashion industry, fashion trends, designers, and other fashion-related topics. (UMF Nos. 6-9.) The Fashion Spot website includes dozens of distinct fashion forums, each covering specific topics. (UMF No. 18.) Within each of those forums, users have created more than 140,000 distinct discussion "threads" in which users comment on each-others' posts. (UMF Nos. 12, 18, 19.) The breadth of these topics (and the opportunity to discuss and debate them) is what draws users to the Fashion Spot website. (UMF No. 13.) The content on both the broader discussion forums and the more specific discussion threads is driven by passionate dedicated users, not Plaintiff. (UMF. No. 19.)

Because the website operates as a community forum, it contains substantial amounts of user-generated content, including user-generated links to outside content. (UMF No. 4.) Each week, forum members generate an average of 7,400 individual posts, some of which contain hyperlinks that display photographs depicting fashion trends, styles, ideas, and other information. (UMF Nos. 10, 23.) Forum users create their own posts, including photographs, independent of Plaintiff, and users entirely control the content they post. (UMF Nos. 24, 25.) The vast majority of photographs posted to the Fashion Spot website are hosted on third-party websites and only displayed on the Fashion Spot by way of hyperlink. (UMF No. 11.) The few photographs actually hosted on Plaintiff's own servers are uploaded and stored solely at the direction of third-party users and linked to forum pages for display by those users. (UMF No. 11.) The content on the Fashion Spot forum, including photographs, is generated entirely by and for forum users. (UMF No. 15.) Plaintiff provides users access to its forums free of charge, and Plaintiff derives its revenue from the Fashion Spot exclusively from advertising. (UMF No. 26.) The Fashion Spot does not operate as a file-sharing site where users exchange digital files. (UMF No. 28.) Instead, the Fashion Spot's value to users is in the discussion itself and users' ability to connect with other users and discuss their interests in fashion. (UMF Nos. 28-30.)

The forums on the Fashion Spot website are run by a smaller group of "moderators" who voluntarily moderate the forums and discussion threads by approving, rejecting, or merging discussion threads and by editing or deleting posts that violate the forum's "Community Rules." (UMF Nos. 31, 34, 37.) Moderators are not Plaintiff's employees, but individual users, and are selected by other users, not by Plaintiff. (UMF Nos. 32, 33.) However, two of Plaintiff's 14 administrators are also forum "administrators" who are independent contractors for Plaintiff. (UMF Nos. 39, 41-42.) All 14 moderators (including the two administrators) manage their forums on their own time from their own personal computer equipment. (UMF No. 39.) Plaintiff does not train, oversee, control, or review any of the moderators' activity. (UMF No. 40.) Moderators do not pre-approve individual posts, but generally review individual posts

within their forums to ensure the posts comply with the forum's civility guidelines and other community rules. (UMF No. 35, 37.) In addition, the two moderators who are also administrators oversee what forums to create and how to organize them, what information to require from members, and they help decide who should be considered as moderators. (UMF No. 43.) The two administrators are the only moderators who receive any compensation from Plaintiff. (UMF No. 44.)

Users join the Fashion Spot community by invitation from other users. (UMF No. 20.) To join, a new user must create an account by filling out an application indicating a user name, the user's email address, and the user's fashion interests. (UMF No. 21.) Once a user has joined the website, he or she may create discussion threads and post comments free of charge. (UMF No. 22.) When a user joins the Fashion Spot website, he or she must agree to abide by the "Forum Community Rules" and the "Fashion Spot Terms and Conditions" before he or she is able to post any content. (UMF No. 45.) The Community Rules govern users' conduct with respect to general civility and decorum (e.g., prohibiting rudeness, profanity, pornography, etc.), while the Terms and Conditions prohibit users from posting or linking to any content that is illegal or that the user does not have the right to make available to others. (UMF Nos. 49, 50.) More specifically, each user agrees "than any User Content that [he or she] post[s] does not and will not violate third-party rights of any kind, including without limitation Intellectual Property … and rights of publicity and privacy." (UMF No. 51.) The Terms and Conditions agreement defines "Intellectual Property" to include "copyright rights." (UMF No. 52.) Each user must further agree not to create any post "contain[ing] any information or content that [he or she] does not have a right to make available under any law or under contractual or fiduciary relationships." (UMF No. 53.)

The Terms and Conditions also inform users that Plaintiff has adopted a policy of terminating repeat copyright infringers. (UMF Nos. 54, 55.) Plaintiff considers a repeat infringer to be a user who on three occasions has posted material that Plaintiff subsequently removed pursuant to a DMCA notice from the copyright holder. (UMF No. 60.) Plaintiff has terminated and continues to terminate accounts pursuant to its infringer policy. (UMF Nos. 59, 60.) Once Plaintiff terminates a user's account, the user can no longer post comments or link content to any forum or discussion thread. (UMF No. 61.) When necessary, Plaintiff will also take steps to prevent a user who has been terminated as a repeat infringer from creating a new account by blocking access based on the users' email address or Internet Protocol address. (UMF No. 62.)

Pursuant to the DMCA, Plaintiff has designated an agent with the United States Copyright office to receive notifications of claimed infringement from copyright holders. (UMF Nos. 56, 57.) Plaintiff does not attempt to prevent copyright holders from collecting information necessary to prepare a takedown notice under the DMCA, and, in fact, assists copyright holders with submitting DMCA-complaint takedown notices.

(UMF Nos. 65, 66, 69.)  Plaintiff has established policies and procedures to receive and respond to DMCA takedown notices submitted to its DMCA agent, and Plaintiff's legal department ensures that access to material identified in a compliant takedown notice is promptly removed – usually within 24 hours.  (UMF Nos. 67, 68.)  After Plaintiff takes down the content subject to a takedown notice, Plaintiff notifies the user who posted the material of the user's right to submit a counter-notification under the DMCA.  (UMF No. 68, 70, 71.)

### B. Defendant's July 10, 2013 Demand Letter and the Instant Action

On July 10, 2013, Defendant sent Plaintiff's DMCA agent (and general counsel) a demand letter and draft complaint asserting that Plaintiff had used three of Defendant's copyrighted images on the Fashion Spot website without authorization.  (UMF No. 78.)  The letter demanded Plaintiff make a settlement payment or face litigation for direct and secondary copyright infringement.  (UMF No. 79.)  Defendant's demand letter included exhibits of three images to which Defendant claimed copyright ownership.  (Dkt. No. 38, ¶7.)  Defendant's demand letter included copies of each of the three photographs and identified the URL for the forum and thread where each of the three images could be found on the Fashion Spot website.  (Dkt No. 1, pp. 27-29.)  However, each page of a given thread on the Fashion Spot website contains many individual posts and often contains many photographs.  (UMF No. 77.)  Nowhere in the demand letter did Defendant identify the specific post containing the allegedly infringing content or the specific URL for the photograph itself (as opposed to the URL for the entire thread).  (UMF No. 80; Dkt. No. 1, pp. 27-29.)  Nor did the demand letter include any sworn statement that Defendant had a "good faith belief that use of the material in the manner complained of [was] not authorized by the copyright owner, its agent, or the law" or "that the information in the notification [was] accurate, and under penalty of perjury, that the complaining party [was] authorized to act on behalf of the owner of an exclusive right that [was] allegedly infringed," as required by 17 U.S.C. section 512(c)(3)(A)(v), (vi).  (UMF No. 80; Dkt. No. 1, pp. 16-18.)

Despite the fact that Defendant's demand letter failed to specifically locate any of the three allegedly infringing images, Plaintiff was able to locate the three photographs by visually comparing each photograph to the numerous photographs on the thread Defendant identified.  (UMF 81.)  Plaintiff promptly disabled access to each of the three photographs within three business days of receiving Defendant's demand letter.  (UMF No. 82.)  After Plaintiff disabled access to each of the three images identified in the demand letter, Defendant continued to assert that Plaintiff was liable for copyright infringement, despite Plaintiff's prompt response to the demand letter.  (Dkt. No. 1, p. 9.)

Plaintiff brought this action for declaratory relief several months later to resolve its ongoing dispute with Defendant. (Dkt. No. 1.) Defendant counterclaimed for direct and vicarious copyright infringement, attaching spreadsheets identifying 577 photographs Defendant claims had been posted to Plaintiff's website, providing an "Infringement#," "ID#," copyright application number, and copyright registration number for most of the allegedly infringing photographs. (Dkt. Nos. 7-1, 7-2, & 7-3; UMF No. 75.) Defendant also identified the URL for the particular thread where Defendant observed the allegedly infringing photograph, although some of the URLs identified were either broken or incomplete. (UMF Nos. 75, 76; Dkt. Nos. 7-1, 7-2, & 7-3.) However, Defendant did not include any of the actual photographs with its counterclaim. (UMF No. 75.) Defendant never sent Plaintiff a separate DMCA takedown notice for any of the photographs listed in the counterclaim. (UMF 74.)

Plaintiff repeatedly asked Defendant to identify the 577 specific photographs at issue in Defendants' counterclaim by identifying the unique "post number"[1] in which the photograph was located, but Defendant refused to provide the requested information. (UMF No. 83.) Instead Defendant provided Plaintiff with a link on May 13, 2014 to a "settlement database" purporting to show copies of the photographs Defendant claimed to be infringing. (UMF No. 84.) That same day, Plaintiff's general counsel instructed Plaintiff's outside counsel to begin manually searching the forums on the Fashion Shop website to visually compare images in the settlement database with images on the Fashion Shop website and remove matching photographs from the website. (Dkt. No. 38, ¶9.) However, none of the photographs in the "settlement database" included any information that would correlate an image in the settlement database with any of the photographs set out in Defendant's counterclaim. (UMF Nso. 103, 104; Dkt. No. 49-1, ¶4.) Moreover, the settlement database only included small, undecipherable thumbnail images of the purportedly infringing photographs and the database repeatedly crashed when Plaintiffs attempted to use it, making it impossible for Plaintiff to utilize the website. (UMF Nos. 85, 86.)

Plaintiff brought these problems with the settlement database to Defendant's attention a week later on May 20, 2104. (UMF No. 87.) At some point, Defendant

---

[1] The Court has already taken judicial notice of what a "post number" is in the context of Plaintiff's website. (Dkt. No. 51, p. 2 n.1.) As the Court previously noted, each page of a discussion thread on Plaintiff's website can include as many as 15 different individual posts. Some of those posts contain one or more photographs while others contain only text. However, every post within a discussion thread includes a sequential number in the top right-hand corner that identifies the individual post within the larger thread. While specifying a URL *and* a "post number" would uniquely identify a specific post (and therefore any photographs contained in that specific post), Defendants spreadsheets only identified a URL, which could refer to as many as 15 separate posts by different users and any number of different images.

fixed the technical problems with the website,[2] but never notified Plaintiff of the changes. (UMF No. 88.) Instead, Plaintiff discovered the changes on its own on May 29, 2014, and immediately began disabling links to the images shown in the settlement database. (UMF No. 89.) By June 3, 2014, Plaintiff had removed access to approximately 75 percent of the images in the settlement database when Defendant made significant changes to the website, which mixed up the order of the images and made it impossible for Plaintiff to know which images it had already processed and which remained to be processed. (UMF Nos. 91, 92.) Plaintiff requested that Defendant restore the settlement database to its previous form so that Plaintiff could continue processing the photographs in the settlement database, and Defendant eventually did so. (UMF No. 93.) Once Defendant restored the database to its original state, Plaintiff finished disabling access to the remaining photos in the settlement database on June 18, 2014. (UMF No. 93.) Had Defendant not mixed up the photos in the settlement database, Plaintiff would have completed the takedown process within days. (UMF No. 94.) All of the images identified in the settlement database were stored on third-party websites, and were only displayed on Plaintiff's website by hypertext links that allowed users to view the material without entering the separate URL where the photographs were stored. (UMF No. 99.) However, third-party forum users selected that content on their own and linked to that content on their own. (UMF Nos. 25, 100.) Plaintiff did not review or approve any user posts to its website, including the posts containing the allegedly infringing images. (UMF No. 101.)

Before Plaintiff received Defendant's demand letter on July 10, 2013, Plaintiff was unaware and had no reason to know that the three images detailed in the demand letter were infringing. (UMF No. 96.) Likewise, prior to receiving Defendant's counterclaim, Plaintiff was unaware and had no reason to know that any of the images described in Defendant's counterclaim were infringing. (UMF No. 97.) Nor did Plaintiff have any knowledge or reason to know that any of the images provided in the settlement database were infringing prior to May 29, 2014 when Plaintiff first got access to a usable settlement database. (UMF No. 98.)

### C. The Instant Motion

Plaintiff now moves for summary judgment on its claim for a declaration that it is immune from liability under the Copyright Act and on Defendant's counterclaim for copyright infringement. (DKt. No. 35.) Defendant did not oppose the motion. Instead, after Defendant received a stipulated extension of time to oppose the motion (Dkt. No. 344), Defendant applied to continue hearing on the motion for want of essential discovery pursuant to Federal Rule of Civil Procedure 56(d) on the eve of its deadline to oppose. (Dkt. No. 46.) The Court denied Defendant's request to continue the hearing

---

[2] However, Defendants never remedied the more fundamental problem that the settlement database failed to associate any of the photographs with any of the copyrights asserted in the counterclaim.

CV-90 (12/02)                  CIVIL MINUTES - GENERAL                  Initials of Deputy Clerk CB

6

on summary judgment, noting that Plaintiff had failed to exercise any diligence in seeking the discovery it sought and that the discovery cutoff had already passed by the time Defendant made its belated application. (Dkt. No. 51; *see also Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027 (9th Cir. 2006) ("Attempting to secure discovery after a discovery cutoff date does not cure a party's failure to conduct diligent discovery beforehand.") Defendant did not seek leave to file a belated opposition after receiving notice of the Court's order denying Defendant's Rule 56(d) request. Nor did Defendant appear at the hearing on the instant motion to offer any oral opposition or request additional time to oppose, despite the fact that the hearing was long noticed for March 23, 2015 *by stipulation of the parties*. (Dkt. Nos. 44, 45, 52.)

## II.     Legal Standard

### A.     Summary Judgment

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine issue of fact." *Mende v. Dun & Bradstreet, Inc.*, 670 F.2d 129, 132 (9th Cir. 1982) (quoting Advisory Committee Notes to Rule 56). An issue is "disputed" for the purposes of summary judgment so long as "reasonable minds could differ as to the import of the evidence… ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). In determining whether summary judgment is appropriate, the court may not weigh evidence to resolve disputed questions (*Chevron Corp. v. Pennzoil, Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992)), and must draw all reasonable inferences in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, the "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson*, 477 U.S. at 251. "The mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient… ." *Id.*, at 252. To avoid summary judgment "there must be evidence on which the jury could reasonably find for the" party opposing summary judgment in light of the "substantive evidentiary burden" applicable at trial. *Id.*, at 252, 254.

The party moving for summary judgment bears the initial burden of demonstrating with admissible evidence that there is no disputed issue of material fact as to a claim for relief or affirmative defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet this burden in one of two ways. In its most traditional form, a party may obtain summary judgment by submitting uncontroverted evidence that affirmatively disproves an essential element of the opposing party's claim or defense. *Adickes v. S.H. Kress & Co.* 398 U.S. 144, 158-60 (1970). This is sometimes referred to

as the "tried-and-true" form of summary judgment. Alternatively, the moving party may carry its initial burden by demonstrating that the opposing party lacks sufficient evidence to prove its claim or affirmative defense at trial. Fed. R. Civ. Proc. 56(c)(1)(B); *Celotex*, 477 U.S. at 325. This form of summary judgment is sometimes known as a "no evidence" motion for summary judgment, and summary judgment on that ground will only lie after the opposing party has had an adequate opportunity to conduct discovery. Fed. R. Civ. Proc. 56(d); *Celotex Corp. v. Catrett*, 477 U.S. at 326.

Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to show a triable issue of material fact. At that point, "[t]he non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial." *Fed. Ins. Co. v. Burlington N. & Santa Fe Ry. Co.*, 270 F.Supp.2d 1183, 1185 (C.D. Cal. 2003). The party opposing summary judgment may "not rest on his allegations … to get to a jury" and avoid summary judgment. *Anderson*, 477 U.S. at 249. "[I]nstead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249). The question is not whether the non-moving party is able to muster *any* evidence that would support its claim for relief but "whether [the evidence] is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52 Nor can a party oppose summary judgment based on theories of liability or affirmative defenses not set forth in the pleadings because "the issues in the complaint guide the parties during discovery and put the defendant on notice of what evidence is necessary to defend against the allegations." *Ortiz v. Lopez*, 688 F.Supp.2d 1072, 1082 (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–1293 (9th Cir.2000).

If a nonmoving party fails to properly address the moving party's assertions of undisputed fact, courts may consider the fact undisputed for the purposes of the motion. Fed. R. Civ. P. 56(e)(2); Local Civ. R. 56-3. The Court may grant summary judgment if the facts considered undisputed by virtue of the nonmoving party's failure to address them) show that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e)(3); Local Civ. R. 7-12.

### B. Direct Copyright Liability

A copyright protects a number of "exclusive rights" vested solely in the holder of a valid copyright. 17 U.S.C. §106. Relevant here, those rights are the rights to (1) reproduce, (2) create derivative works, (3) distribute, and (4) publicly display the copyrighted work. 17 U.S.C. §106(1)-(3), (5).[3] Courts "recognize three doctrines of copyright liability" for usurpation of those exclusive rights: "direct copyright

---

[3] The other two exclusive rights provided under the Copyright Act – to perform publicly and to perform by means of digital auto transmission – do not apply to images. 17 U.S.C. §106(4), (5).

infringement, contributory copyright infringement, and vicarious copyright infringement." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). In this action, Defendant counterclaims for direct and vicarious copyright infringement. (Dkt. No. 7, ¶¶49-66.)[4] Plaintiff seeks a declaration that it is not liable for copyright infringement and it is immune from liability as a service provider under the DMCA's so-called "safe harbor" provision found in 17 U.S.C. section 512. (Dkt. No. 1, ¶¶16-22.)

To succeed on a claim of direct copyright infringement, Defendant must be able to satisfy two elements: "(1) [it] must show ownership of the allegedly infringed material and (2) [it] must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). "To prove a claim of direct copyright infringement, a plaintiff must show...that the defendant *himself* violated one or more of the plaintiff's exclusive rights under the Copyright Act." *Ellison v. Robertson*, 357 F.3d at 1076) (emphasis added). "There is no need to prove anything about a defendant's mental state to establish copyright infringement; it is a strict liability tort." *Educational Testing Service v. Simon*, 95 F. Supp. 2d 1081, 1087 (C.D. Cal. 1999).

Still, to establish causation on a claim for direct liability, "defendants must *actively* engage in one of the activities recognized in the Copyright Act." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1168 (C.D. Cal. 2002) (emphasis in original). In the context of online copyright infringement, a plaintiff asserting direct liability must show the defendant "himself uploaded or downloaded the files, or directly caused such uploading or downloading to occur." *Sega Enterprises, Ltd. v. MAPHIA*, 948 F. Supp. 923, 932 (N.D. Cal. 1996) (no liability for direct infringement against proprietor of online bulletin board system where proprietor operated online bulletin board, knew infringing activity was occurring, and solicited others to upload infringing content). This showing is necessary to establish the basic element of causation on a claim for direct infringement because "the purpose of any causation-based liability doctrine is to identify the actor (or actors) whose 'conduct has been so significant and important a cause that [he or she] should be legally responsible.'" *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008), (quoting W. Page Keeton et al., *Prosser and Keeton on Torts* § 42, at 273 (5th ed.1984).[5]

---

[4] Defendant also includes counterclaims for "injunction" and "attorney fees and costs," neither of which is an independent cause of action.

[5] As another court in this district noted, this element of *direct* causation on a claim for direct liability has sometimes been inartfully described as a requirement of "volitional conduct." *See Perfect 10, Inc. v. Giganews, Inc.,* No. CV11-07098 AHM SHX, 2013 WL 2109963, at *6 (C.D. Cal. Mar. 8, 2013). The phrase "volitional conduct" is somewhat confusing because a claim for direct liability does not require any showing of intent. *Educational Testing Service v. Simon*, *supra*, 95 F. Supp. 2d at 1087.

For direct liability, "the question is *who* made this copy." *Perfect 10, Inc. v. Giganews, Inc.*, No. CV11-07098 AHM SHX, 2013 WL 2109963, at *6 (C.D. Cal. Mar. 8, 2013) (quoting *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2nd Cir.2008). As the Fourth Circuit observed, a system that "automatically transmits users' material but is itself totally indifferent to the material's content" is no more the direct cause of acts committed by its subscribers than is "a traditional telephone company when it transmits the contents of its users' conversations." *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004). For direct liability, a plaintiff must do more than show an online service provider passively stored or displayed copyrighted material uploaded by others on a system indifferent to content. A plaintiff must show "that it was [the defendants] themselves that committed the act of copying, displaying or distributing [the] copyrighted content." *Perfect 10, Inc. v. Giganews, Inc.*, 2013 WL 2109963, at *7 (dismissing claim of direct liability where plaintiff alleged online service provider stored infringing material on its servers, programmed its servers to download and distribute infringing content, and controlled which materials were distributed to and downloaded from third-party servers).

### C. Vicarious Copyright Infringement

"[T]he lines between direct infringement, contributory infringement and vicarious liability are not clearly drawn … ." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 434 n.17 (1984) (internal quotation omitted). However, "in general, contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement, while vicarious liability is based on the defendant's failure to cause a third party to stop its directly infringing activities. *Perfect 10, Inc. v. Amazon.com, Inc.* ("*Amazon*"), 508 F.3d 1146, 1175 (9th Cir. 2007). "Whereas contributory infringement is based on tort-law principles of enterprise liability and imputed intent, vicarious infringement's roots lie in the agency principles of *respondeat superior*." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n* ("*Visa*"), 494 F.3d 788, 802 (9th Cir. 2007). Because vicarious liability arises out of principles of agency, a claim for vicarious infringement requires evidence of some level of principle-agent relationship. To prevail on a claim for vicarious infringement, then, a plaintiff must prove "that the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Visa*, 494 F.3d at 788 (footnote omitted). Both elements are essential to a claim of vicarious infringement, and failure to satisfy either element is fatal to a claim for vicarious infringement. *Id.* at 806 (declining to reach the element of direct financial interest because plaintiff failed to allege defendant

---

Instead, this element of *direct* liability is better thought of as a requirement of *direct* causation. Put simply, a defendant may not be held liable for direct liability if someone else did the copying. *Ellison v. Robertson*, *supra*, 357 F.3d at 1076 (To prove a claim of direct copyright infringement, a plaintiff must show...that the defendant *himself* violated one or more of the plaintiff's exclusive rights under the Copyright Act.") (emphasis added).

had the right or ability to control); *Ellison v. Robertson*, 357 F.3d at 1079 n.10 (declining to reach the element of the right or ability to control because there was no evidence that defendant received a direct financial benefit from third-party infringement).

"The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d at 1079. "Financial benefit exists where the availability of infringing material acts as a 'draw' for customers." *A&M Records, Inc. v. Napster, Inc.* ("*Napster*"), 239 F.3d 1004, 1023 (9th Cir. 2001) (internal quotes omitted). The size of the "draw" relative to a defendant's overall business is immaterial. A defendant receives a "direct financial benefit" from third-party infringement so long as the infringement of third parties acts as a "draw" for customers "regardless of *how substantial* the benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d at 1079.

Still, a "direct financial benefit" demands more than evidence that customers were "drawn" to a website to obtain access to infringing material in general. To prove vicarious liability a plaintiff must demonstrate a *causal relationship* between the specific infringing activity at issue in the case and a financial benefit to the defendant. *Elison v. Robertson*, 357 F.3d at 1079; *see also Wolk v. Kodak Imaging Network, Inc.*, 840 F.Supp.2d 724, 748 (S.D.N.Y. 2012) (no evidence of direct financial benefit for purposes of vicarious infringement where there was "no evidence indicating that either [of the defendants] capitalizes specifically because a given image a user selects to print is infringing" and because "Defendants' profits are derived from the service they provide, not a particular infringement.").

### D. The DMCA's Safe Harbor Provision

"Enacted in 1998, the DMCA was 'designed to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age.'" *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1141 (N.D. Cal. 2008) (quoting S. Rep. No. 105-190, at 1-2 (1998). The DMCA achieves this goal in part by providing a "safe harbor" from copyright damages for online service providers who "cooperate to detect and deal with copyright infringements that take place in the digital networked environment." *Io Group, Inc. v. Vehoh Networks, Inc.*, 586 F. Supp. 2d at 1141 (quoting S. Rep. 105-190, at 20 (1998)). "The DMCA establishes safe harbors that protect service providers from liability for (1) transitory digital network communications; (2) system caching; (3) information residing on systems or networks at the direction of users; and (4) information location tools." *Ellison v. Robertson*, *supra*, 357 F.3d at 1076-77. Those four safe harbors provided in the DMCA "preclude imposing monetary liability on service

providers for copyright infringement that occurs as a result of specified activities." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013). Those protections apply to "secondary infringers as well a direct infringers." *Amazon*, 508 F.3d at 1175.

A service provider must satisfy certain conditions to be eligible for any of the four safe harbors. As a threshold matter, service providers must "(1) adopt a policy that provides for the termination of service access for repeat copyright infringers in appropriate circumstances; (2) implement that policy in a reasonable manner; and (3) inform its subscribers of the policy." *Ellison v. Robertson*, 357 F.3d at 1080; 17 U.S.C. §512(i)(1)(A). A service provider "reasonably implements" a repeat infringer policy "if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications." *CCBill*, 488 F.3d at 1109. However, a service provider "need not affirmatively police its users for evidence of repeat infringement." *Id*. Although a service provider may not actively ignore "red flags" when it is "aware of facts or circumstances from which infringing activity is apparent," court's will not infer awareness where a copyright holder attempts to notify the service provider of alleged infringement with a notification "that fails to substantially comply with [17 U.S.C.] § 512(c)(3)...." *Id*., at 1114.

Rather, to constitute "effective ... notification of claimed infringement" a copyright holder must submit "a written communication" to the service provider's "designated agent" including :

> "(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.
>
> (ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.
>
> (iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.
>
> (iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

> (v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.
>
> (vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed."

17 U.S.C. §512(3).

In addition, a service provider seeking the protection of any DMCA safe harbor must "accommodate[] and…not interfere with standard technical measures" for identifying infringing material. 17 U.S.C. §512(i)(a)(B). "Standard technical measures" are measures that "(A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process; (B) are available to any person on reasonable and nondiscriminatory terms; and (C) do not impose substantial costs on service providers or substantial burdens on their systems or networks." *Id*.

A service provider who establishes and enforces a reasonable repeat infringer policy and who accommodates standard technical measures for identifying infringing material may seek protection for any of the four qualifying safe harbors. Relevant here, is the so-called "information location tools" safe harbor provision. 17 U.S.C. §512(d). Under that safe harbor, "a service provider shall not be liable for monetary relief … for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference pointer, or hypertext link…." 17 U.S.C. §512(d). To qualify for the "information location tools" safe harbor provision, however, a service provider must:

1. Be unaware and not have reason to know of the specific infringing material;

2. Act expeditiously to remove or disable access to the infringing material "upon obtaining such knowledge or awareness";

3. Not receive a direct financial benefit from infringing material over which it exercised control; and

4. Respond expeditiously to remove or disable access to infringing material upon receipt of a compliant takedown notice provided pursuant to 17 U.S.C. §512(c)(3).

17 U.S.C. §512(d).

III.  Discussion

    A.    **The Undisputed Evidence Shows Plaintiff Is Immune from Liability for Monetary Relief Under 17 U.S.C. §512(d)**

        As a threshold matter, the evidence is undisputed that Plaintiff is a "service provider" within the meaning of section 512. A service provider for the purposes of the "information location tools" safe harbor provision "means a provider of online services or network access, or the operator of facilities therefor… ." 17 U.S.C. §512(k)(1)(B). This "broad definition" generally includes website operators, particularly operators that provide users with the opportunity to post their own content, (*Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1088 (C.D. Cal. 2001), and there is no dispute that Plaintiff is a "service provider" within the meaning the "information location tools" safe harbor. Plaintiff operates a web-based social discussion forum with more than 70,000 account holders worldwide, and unquestionably "provides online services." (UMF Nos. 1, 2.) *See also In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 658 (N.D. Ill. 2002) *aff'd*, 334 F.3d 643 (7th Cir. 2003) ("'service provider' is defined so broadly that we have trouble imagining the existence of an online service that would not fall under the definitions").

        The evidence is also undisputed that Plaintiff satisfies the repeat infringer requirements of section 512(i). Plaintiff has adopted an express policy of terminating accounts of repeat infringers – users who have posted three or more infringing images – and routinely implements that policy by terminating repeat infringers. (UMF Nos. 59-62.) Plaintiff implements that policy in part by utilizing an efficient DMCA takedown process that generally disables access to infringing content within 24-hours of receiving a DMCA takedown notice. (UMF Nos. 68-71.) Once terminated, a repeat infringer is precluded from posting any more content to the website, and Plaintiff takes active steps prevent those users from returning to the website under different user names. (UMF Nos. 61, 62.) Plaintiff notifies every user of this policy in its Terms and Conditions, and requires every user to accept the Terms and Conditions as a precondition to joining the website. (UMF Nos. 54, 55, 58.) And rather than preventing copyright holders from identifying infringing material or frustrating standard technical measures for doing so, Plaintiff actively assists copyright holders in their efforts to identify infringing material, even when a copyright holder submits a deficient DMCA notice. (UMF Nos. 64-69.)

        As to the specific elements of the "information location tools" safe harbor provision, the undisputed evidence conclusively shows that Plaintiff is immune from monetary damages. Plaintiff did not know or have any reason to know that any of the images at issue in this litigation was infringing until Defendant sent its demand letter, filed its counterclaims, and provided Plaintiff with usable access to the settlement

database. 17 U.S.C. §§512(d)(1)(A), (B). However, Plaintiff expeditiously removed every allegedly infringing image from its website at issue in this litigation within a matter of days despite Defendant's deficient DMCA notices.[6] 17 U.S.C. §§512(d)(1)(C), (d)(3); UMF Nos. 81, 82, 91-94. Nor did Plaintiff receive any financial benefit directly attributable to the infringing activity. 17 U.S.C. §512(d)(2). Plaintiff receives all of its revenue for the Fashion Shop website from advertising, and is not paid by any user to either access or distribute any content, including the photos at issue in this action. (UMF No. 26.) And while the amount of revenue Plaintiff receives from its website is almost certainly tied to its overall number of users, the undisputed evidence shows that none of allegedly infringing content in this action constituted a "draw" to Plaintiff's website. *Compare Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1045 (9th Cir. 2013) (website operator received direct financial benefit from infringing activity by way of advertising revenue where website operator directly "promoted advertising by pointing to infringing activity," "attracted primarily visitors who were seeking to engage in infringing activity," and "encouraged that infringing activity" such that operator's "revenue stream was tied directly to the infringing activity involving his websites").

The fact that some customers may have valued the opportunity to link or view infringing content once they were already members of the website is immaterial. *Ellison v. Robertson*, 357 F.3d at 1079. The operative question is whether the opportunity to link or view Defendants specific infringing images "constitute[ed] a draw for subscribers, not just an added benefit." *Id*. The undisputed evidence shows that "the opportunity *for discussion and debate on a wide range of fashion topics* is what draws people to the Forum," not any of the specific images at issue in this litigation. (UMF Nos. 13 (emphasis added); *see also* UMF Nos. 28-30.) "The record lacks evidence" and affirmatively disproves that Plaintiff "attracted or retained [users] *because of the infringement* or lost subscriptions because of [Plaintiffs] eventual obstruction of the infringement. Accordingly, no jury could reasonably conclude that [Plaintiff] received a direct financial benefit from providing access to the infringing material." *Ellison v. Robertson*, 357 F.3d at 1079 (emphasis added).[7]

---

[6] It is worth noting, however, that neither the demand letter, nor the counterclaim, nor the settlement database could be used to impute knowledge under the DMCA. None of those attempts at notification satisfied the notice requirements set forth in section 512(c)(3). In addition to the fact that none of the documents identified the post number necessary to expeditiously identify the specific infringing material at issue (17 U.S.C. §512(c)(3)(a)(iii)), Defendant also failed to include any sworn statement of copyright ownership, accuracy, or infringement. 17 U.S.C. §512(c)(3)(A)(v), (vi). Because those attempts at notification failed to substantially comply with the requirements for a DMCA takedown notice, they "shall not be considered…in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent."

[7] Because the undisputed evidence shows Plaintiff did not financially benefit directly from the allege infringement, the Court need not determine whether Plaintiff had the right and ability to control the

CV-90 (12/02)　　　　　　　　　　　　　　CIVIL MINUTES - GENERAL　　　　　　　　　　　　Initials of Deputy Clerk CB

15

Because the undisputed evidence shows Plaintiff meets the requirements for safe harbor under section 512(d), Plaintiff "shall not be liable for monetary relief … for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a…hypertext link…." 17 U.S.C. §512(d). Here, the evidence is undisputed that none of the images at issue in this litigation were stored on Plaintiffs servers, and were only displayed on Plaintiff's website by hypertext links to third-party websites. (UMF No. 99.) The undisputed evidence further shows that the images in question were linked entirely by third-party users and Plaintiff did not review or approve any of the linked images prior to posting. (UMF Nos. 4, 5, 23-25, 99-101.) Because Plaintiff qualifies for relief under the DMCA's "information location tools" safe harbor provision, Plaintiff "shall not be liable for monetary relief' (17 U.S.C. §512(d)) on any claim of direct or secondary infringement, including "damages, costs, attorneys' fees, and any other form of monetary payment." 17 U.S.C. §512(k)(2).

### B. The Undisputed Evidence Shows Plaintiff Is Not Otherwise Subject to Liability

Although Plaintiff is not subject to liability for monetary relief, that is not the end of the inquiry. The DMCA's safe harbors "limit liability" for copyright infringement, but they "do not affect the question of ultimate liability under the various doctrines of direct, vicarious, and contributory liability." *Perfect 10, Inc. v. CCBill LLC*, ("*CCBill*") 488 F.3d 1102, 1109 (9th Cir. 2007) (internal quotes omitted). Under certain circumstances, qualifying service providers may still be subject to an injunction, even if they are protected from monetary liability. 17 U.S.C. 512(j). Because Plaintiff also seeks injunctive relief under the Copyright Act (Dkt. No. 7, p. 12), the Court must still consider the question of ultimate liability for direct and vicarious copyright infringement.

Beginning briefly with vicarious infringement, the Court's conclusion that Plaintiff did not directly financially benefit from any of the infringement at issue in this action also precludes a claim for vicarious infringement, which requires a showing of "a direct financial interest in the infringing activity." *Visa*, *supra*, 494 F.3d at 788 (footnote omitted). Because the undisputed evidence shows Plaintiff did not receive any direct financial benefit from the alleged infringing activity, Defendant's claim for vicarious infringement fails as a matter of law, and the Court need not consider whether Plaintiff had the ability to control any of the infringing activity. *Ellison v. Robertson*, 357 F.3d at 1079 n.10 (declining to reach the element of the right or ability to control because there was no evidence that defendant received a direct financial benefit from third-party infringement).

---

infringing activity. *See Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1045 (9th Cir. 2013) (the "emphasis" in §512(d)(2) "is on the lack of direct financial benefit requirement, with the right to control prong secondary").

That the undisputed evidence shows all of the images at issue in this action were stored on third-party websites and linked exclusively by third-parties also precludes any claim for direct infringement as a matter of law. "[I]n-line linked images that appear on a user's computer screen" do not, by themselves constitute direct infringement where the website displaying the images does "not store the photographic images" on its own servers. *Amazon*, *supra*, 508 F.3d at 1160-61. Providing "HTML instructions that direct a user's browser to a website…that stores the full-size photographic image…is not the equivalent to showing a copy." *Id.* at 1161. "The HTML merely gives the address of the image to the user's browser. The browser then interacts with the computer that stores the infringing image. It is this interaction that causes an infringing image to appear on the user's computer screen." *Id.* To the extent Plaintiff's website facilitates that interaction between a third-party user and a third-party server, "such assistance raises only contributory liability issues," which Defendant does not assert. *Id.* However, it "does not constitute direct infringement of the copyright owner's display rights." *Id.* Nor does a hypertext link to an off-site infringing image violate Defendants' right to distribute, because it is the third-party's computer, not Plaintiff itself, that transmits the image to the end-user. *Id.*, at 162.

Defendant also cursorily alleges that Plaintiff violated Defendants' rights to reproduce and create derivative works from the allegedly infringing images. (Dkt. No. 7, ¶52.) However, Plaintiff fails to allege that Plaintiff created any derivative work from the allegedly copyrighted images. *See Fox v. Good Samaritan L.P.*, 2010 WL 1260203, at *11 (N.D. Cal. Mar.29, 2010) ("While a summary judgment motion does go beyond the pleadings in the sense that it tests the sufficiency of the evidence to support the allegations of the complaint, those allegations still serve to frame—and limit—the issues."). Nor does Plaintiff allege or explain how Plaintiff can be said to have reproduced a copy of an image that was never stored on Plaintiff's servers and never directly interacted with any of Plaintiff's servers. The undisputed evidence shows that Plaintiff did not even *passively* store or reproduce copyrighted material uploaded by others, let alone *actively* copy the material by its own conduct. *Perfect 10, Inc. v. Giganews, Inc.*, 2013 WL 2109963, at *7. Plaintiff "does not have any 'material objects…in which a work is fixed…and from which the work can be …perceived, *reproduced*, or otherwise communicated" and thus cannot communicate a copy. *Amazon*, 508 F.3d at 1160-61 (quoting 17 U.S.C. §101) (emphasis added).

## IV. Conclusion

Because Defendant failed to oppose the motion, the Court considers Plaintiff's undisputed facts (all of which are supported by the evidence) as undisputed for the purposes of the motion. Fed. R. Civ. P. 56(e)(2); Local Civ. R. 56-3. The undisputed evidence before the Court on this unopposed motion shows that Defendant is an online service provider who has adopted and implements a reasonable repeat infringer policy

and actively assists copyright holders in disabling access to infringing material through an efficient and responsive takedown process. Plaintiff further satisfies the necessary elements for safe harbor protection under 17 U.S.C. §512(d), and may not be held liable for monetary relief for "referring or linking users to an online location containing infringing material or infringing activity…." 17 U.S.C. §512(d). Because that is precisely the activity for which Defendant seeks to hold Plaintiff liable, the DMCA's safe harbor precludes Plaintiff's claims for damages and attorneys' fees. 17 U.S.C. §§512(d), (k)(2).

Even looking at the more limited claim for injunctive relief, the undisputed evidence shows that Plaintiff is not liable for vicarious or direct copyright infringement as a matter of law. Defendant does not receive a direct financial benefit from any of the infringing activity at issue in this action, nor does Plaintiff actively engage in any act of infringement, all of which is accomplished by and through third-party users and servers.

Because the undisputed evidence shows that Plaintiff is entitled to safe harbor protection and that Defendant's counterclaims fail as a matter of law, the Court **GRANTS** the motion for summary judgment in its entirety. Fed. R. Civ. P. 56(e)(3); Local Civ. R. 7-12. Plaintiff is directed to submit an amended proposed order of judgment reflecting the continued hearing date on this motion within 5 days. Defendant shall lodge any objections to the form of Plaintiff's amended proposed judgment within 5 days of service of the amended proposed judgment.

**IT IS SO ORDERED.**